NO. 12-03-00379-CR
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
LIONEL SIMPSON,                                          §                APPEAL FROM THE THIRD
APPELLANT
 
V.                                                                         §                JUDICIAL DISTRICT COURT OF

THE STATE OF TEXAS,
APPELLEE                                                         §                ANDERSON COUNTY, TEXAS
                                                                                                                                                            
OPINION
            Lionel Simpson appeals his conviction for capital murder. In three issues, Appellant contends
that the trial court erred in admitting certain evidence and that the evidence was insufficient to
corroborate the testimony of the accomplice witnesses. We affirm.
 
Background
            After Geraldine Davidson, an eighty-three year old retired schoolteacher, was reported
missing on January 26, 2000, her body was discovered in the Neches River. Appellant’s brother,
Danielle Simpson, immediately became a suspect in Davidson’s disappearance and murder. On
January 28, as the police searched a known drug house in an attempt to locate Danielle, they
discovered Appellant. He was taken into custody because the officers had probable cause to believe
that delinquent conduct was occurring in their presence or view. Because Appellant was a juvenile,
he was taken to the juvenile detention center. The same day, Jennifer Simpson, an accomplice, made
a voluntary statement to authorities implicating Appellant in Davidson’s murder. At a detention
hearing in juvenile court on January 31, the court ordered that Appellant remain detained because he
was accused of committing a felony offense and/or might be dangerous to himself or others if
released. After the State petitioned the juvenile court for a discretionary transfer to adult criminal
court,


 the court ordered a complete diagnostic study of Appellant.


 As a result, Mary Cox, Ph.D.,
conducted a psychological examination of Appellant. Cox testified at the transfer hearing, and the
examination was admitted into evidence. The juvenile court waived its exclusive original jurisdiction
as to the felony offense alleged and ordered that the case be immediately transferred to the
appropriate criminal district court.


 Thereafter, Appellant was charged by indictment with the capital
murder of Geraldine Davidson. Appellant pleaded “not guilty.”
            The State presented approximately twenty-seven witnesses at trial. Two were accomplice
witnesses. The first, Jennifer Simpson, testified that she pleaded guilty to Davidson’s murder and
was sentenced to life imprisonment. At the time of Davidson’s murder, she was married to
Appellant’s brother, Danielle. Jennifer testified that, on the morning of January 26, 2000, she,
Danielle, and Edward “Pete” McCoy broke into Davidson’s house, while Davidson was out, in an
attempt to steal money. When Davidson returned home, Danielle asked her for money, but Davidson
stated that she had none. On Danielle’s instructions, Jennifer put tape across Davidson’s mouth, and
Pete helped Danielle put Davidson in the trunk of Davidson’s car. The three stole forty dollars from
Davidson’s purse and threw the purse and the contents of her car behind an old Wal-Mart, which was
located between some apartments by a field. They also obtained and smoked some marijuana.
Jennifer testified that the three spent the next few hours traveling to various towns and places in
Davidson’s car. When they returned to Palestine, they parked the vehicle and walked to their house.



At approximately 3:00 to 3:30 p.m., they walked back to the car with Christina Walker, Pete’s sister.
As Christina got in the car, she heard Davidson kick the trunk. According to Jennifer, as they were
driving back by their house, Christina asked to be dropped off. Jennifer, Danielle, and Pete then went
to the Swantz Inn to pick up Appellant. Jennifer testified that Appellant asked Danielle if he “[did]
it,” and Danielle responded “yeah.” Then, Appellant got in the vehicle and they traveled to a Jack-in-the-Box. Jennifer was sent inside to get food, and Appellant followed her in later, telling her to
hurry. Jennifer testified that Appellant was wearing an orange toboggan and a Green Bay Packers
jacket at the time. 
            After getting the food, they drove to Wal-Mart where Appellant bought heavy gray tape.
Jennifer testified that Appellant and Danielle also talked about a river. They drove the vehicle to a
dead-end spot because Appellant wanted to see Davidson. All of them got out of the vehicle, and
Danielle opened the trunk. According to Jennifer, Appellant took Davidson from the trunk and threw
her “sort of roughly” on the ground. Appellant “flipped” Davidson over, taped her hands and mouth,
and then wound the tape around her head. Once back in Davidson’s car, they went to an old house
where Appellant found a cinder block and put it in the trunk. She believed Appellant began tying the
cinder block to Davidson’s leg. Jennifer stated that she heard “something like [Appellant] hitting
her.” Once back in the vehicle, Appellant told them that he had hit Davidson and that “he never liked
white folks anyway.” Jennifer testified that, to her knowledge, neither she, Pete, nor Danielle had
hit Davidson.
            At that point, they went to the river. Danielle backed the vehicle up to the river, and he and
Appellant got out. Jennifer pushed the brake and heard them “messing” with Davidson. Someone
told Pete to get out of the car to get a stick, and Pete got out of the car. Jennifer believed she saw
both Appellant’s and Danielle’s arms move as if they were throwing something. After they left the
river, they took Appellant to McDonald’s and to the house of his girlfriend, Occtayvia Clewis.
Jennifer said that throughout the next two days, Danielle attempted to avoid the police and she had
sporadic contact with Appellant. She was taken to the juvenile detention center after she voluntarily
agreed to make a statement.
            Pete, the other accomplice witness, testified that he pleaded guilty to capital murder and was
sentenced to thirteen years in the Texas Youth Commission. Pete was Appellant’s and Danielle’s
cousin. Pete testified that he accompanied Danielle and Jennifer to Davidson’s house to steal money.
Pete’s version of Davidson’s kidnapping and murder was similar to Jennifer’s, although he denied
helping Danielle put Davidson in the trunk of her car. Pete testified that when they picked up
Appellant near the Swantz Inn, Danielle opened the trunk and showed Davidson to other persons,
including Appellant. According to Pete, Appellant was wearing a Green Bay Packers jacket and
orange toboggan. After Appellant saw Davidson in the trunk and before he got in the car, Pete heard
Appellant tell Danielle “[l]et’s go kill her.” He testified, as Jennifer had, that Appellant took
Davidson out of the trunk and “slammed” her on the ground and back into the trunk after “yank[ing]”
the tape around her mouth and legs. Further, Pete testified that Appellant hit Davidson again. Pete
also heard Appellant hitting Davidson after he put the cinder block in the trunk.
            Once they were at the river, Appellant told Pete to get out of the car and he did. Pete testified
that he did not comply when Appellant instructed him to get a stick. He also testified that, once
Davidson was out of the trunk, Danielle kicked her in the face and threw the cinder block into the
water. Then, Danielle and Appellant together swung Davidson and threw her in the river. According
to Pete, Davidson was moaning and kicking when she hit the water. Danielle went to look for more
money in the area where he had thrown Davidson’s purse. There he threw out the trash in the car,
including the Jack-in-the-Box bag. Danielle then took Pete home. According to Pete, he later made
a voluntary statement that Danielle picked him up in a car. In his statement, Pete said that, after
traveling to another town, he asked to be taken home when he discovered that Davidson was in the
trunk. He was eventually arrested after further investigation revealed that he had not been truthful.
Pete identified a Green Bay Packers jacket in evidence as Appellant’s and identified himself, Jennifer,
and Appellant in the January 26 Jack-in-the-Box surveillance tape. 
            At the conclusion of the trial, the jury found Appellant guilty of capital murder and was
sentenced by the trial court to life imprisonment. This appeal followed.
 
Admissibility of Appellant’s Letter
            In his first issue, Appellant argues that the trial court erred in admitting a portion of a letter
from Appellant to his girlfriend because the letter was not relevant.
Standard of Review and Applicable Law
            We review a trial court’s ruling on admissibility under an abuse of discretion standard. West
v. State, 121 S.W.3d 95, 100 (Tex. App.–Fort Worth 2003, pet. ref’d) (citing Angleton v. State, 971
S.W.2d 65, 67 (Tex. Crim. App. 1998)). We will not reverse a trial court as long as its ruling was
within the “zone of reasonable disagreement.” Montgomery v. State, 810 S.W.2d 372, 391 (Tex.
Crim. App. 1990) (op. on reh’g); Reed v. State, 59 S.W.3d 278, 280 (Tex. App.–Fort Worth 2001,
pet. ref’d). Evidence is “relevant” if it has any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than it would be
without the evidence. Tex. R. Evid. 401. In other words, evidence must satisfy two requirements
to be relevant–materiality and probativeness. Cooper v. State, 95 S.W.3d 488, 490-91 (Tex.
App.–Houston [1st Dist.] 2002, pet. ref’d) (citing Miller v. State, 36 S.W.3d 503, 507 (Tex. Crim.
App. 2001)). Evidence merely tending to affect the probability of the truth or falsity of a fact in issue
is logically relevant. Montgomery, 810 S.W.2d at 376. To be relevant, the evidence need not by
itself prove or disprove a particular fact. Id. It is sufficient if the evidence provides a small nudge
toward proving or disproving some fact of consequence. Id.
Analysis
            The trial court admitted into evidence the following excerpt from a letter Appellant wrote his
girlfriend while in jail:
 
[Anyway] my court day was pretty good they just ask me stuff like was I guilty are [sic] not I said not
guilty witch [sic] I am I got another court day coming up but I don’t know what day but when I find
out I’ll let you know[.]


            The excerpt was material because it was a declaration made by Appellant regarding his guilt.
His guilt or innocence is, in itself, a “fact of consequence” in determining whether he committed
capital murder. See Miller, 36 S.W.3d at 507. The excerpt could have been read to mean that
Appellant pleaded not guilty and was not guilty, or that he pleaded not guilty, but was guilty of the
charged offense. Either reading could provide the jury with a “small nudge” towards determining
whether Appellant committed the charged offense, a fact of consequence. See Montgomery, 810
S.W.2d at 376. Therefore, the excerpt was probative. Because the excerpt from Appellant’s letter
was both material and probative, it was relevant. See Tex. R. Evid. 401. The trial court did not
abuse its discretion by admitting the letter into evidence. Accordingly, Appellant’s first issue is
overruled.
 
 
Admissibility of Appellant’s Statement
            In his second issue, Appellant contends that the trial court erred in admitting a statement he
made during a juvenile certification and competency examination. The State argues that Appellant 
waived any global statutory and state constitutional objections when he failed to clearly state these
objections to the trial court and obtain rulings. Further, the State contends that Appellant’s statement
was not the result of a custodial interrogation because it was a volunteered, spontaneous, and
unexpected answer to an innocuous question.
Applicable Law
            A juvenile court may waive its exclusive original jurisdiction and transfer a child to the
appropriate district court. Tex. Fam. Code Ann. § 54.02(a) (Vernon 2002). Prior to the hearing to
consider transfer of the child, the juvenile court shall order and obtain a complete diagnostic study,
social evaluation, and full investigation of the child, his circumstances, and the circumstances of the
alleged offense. Tex. Fam. Code Ann. § 54.02(c), (d) (Vernon 2002). The sole purpose of the
examination is to provide evidence for the certification hearing. Cantu v. State, 994 S.W.2d 721,
734 (Tex. App.–Austin 1999, pet. ref’d). When used only for its intended purpose, the examination
is not a custodial interrogation. See id.
            Notwithstanding the neutral nature of the psychological examination, the statements a juvenile
utters during the examination are not automatically removed from the reach of the Fifth Amendment. 
Estelle v. Smith, 451 U.S. 454, 465, 101 S. Ct. 1866, 1874, 68 L. Ed. 2d 359 (1981). If the
examination exceeds its intended purpose and becomes a source of incriminating evidence against
a defendant, the examination constitutes a custodial interrogation to which Fifth Amendment
protections apply. Cantu, 994 S.W.2d at 734. If a juvenile is not adequately informed of his Fifth
Amendment rights with respect to the diagnostic examination or that his testimony during that
examination would be used against him in an adjudicatory proceeding, a waiver of his rights is
ineffective. Cantu, 994 S.W.2d at 735; see also Estelle, 451 U.S. at 469, 101 S. Ct. at 1876. 
            The psychological examination, in itself, does not constitute a critical stage triggering Sixth
Amendment protection. Hidalgo v. State, 983 S.W.2d 746, 755 (Tex. Crim. App. 1999). Nor does
a juvenile have a right to have counsel present during the examination. Cantu, 994 S.W.2d at 736.
However, when the psychological examination is used both as the basis of the psychologist’s
determination that the juvenile should be transferred and as a source of incriminating evidence
introduced at trial, it serves a “dual purpose.” See Cantu, 994 S.W.2d at 736. In that instance, the
diagnostic examination is a “critical stage” of the adversarial proceedings against a juvenile defendant
warranting Sixth Amendment protection. Cantu, 994 S.W.2d at 736-37. 
Appellant’s Objection and Cox’s Testimony
            Here, the State requested that Mary Cox, Ph.D., a psychologist, be allowed to testify at trial 
regarding a statement Appellant made during the court-ordered psychological examination. The State 
argued that the purpose of the examination was not to elicit incriminating evidence for trial and that
Appellant made a spontaneous statement. According to the State, Cox’s question was neutral and
Appellant had been warned by a magistrate. Appellant argued that he was in custody and being
interrogated by Cox. He could not waive his right to counsel because he did not have counsel when
Cox began the examination. Further, Appellant contended he was not told that the diagnostic
examination could be used against him at trial. The trial court found that Cox was not the police and
that the examination was a neutral hearing for the purpose of evaluating Appellant in order to
determine if he should be tried as an adult. Thus, the trial court overruled Appellant’s objection. The
trial court stated that if the purpose of the examination were anything else, it would have sustained
the objection.
            Cox testified that she performed a psychological examination of Appellant on January 29,
2000. Although Cox informed Appellant of the purpose of the examination, she did not advise him
that she could testify against him. At the first interview, Cox observed that Appellant was lucid,
oriented, and of such intelligence that he understood what was happening. Cox then began
questioning Appellant regarding his competency. Appellant stated that he did not know the charges
against him. Cox asked Appellant, “Well, what do they tell you you’re charged with[?]” According
to Cox, Appellant said, “They say that they’re going to charge me with capital murder, but they can’t
do that. I know I’m going to have to do some time because I was there. I went to the river with them,
but I didn’t get out of the car. I stayed in the back seat with Pete so they can’t get me for capital
murder.” After Appellant’s statement, Cox resumed her questions, asking him if he knew who his
attorney was and what the attorney’s job would be.
  
Analysis
            At the outset, we note that Appellant does not separately argue his state and federal
constitutional claims or argue that the Texas constitutional protections differ in any significant way
from the Fifth and Sixth Amendments to the United States Constitution. To adequately brief a state
constitutional issue, Appellant must proffer specific arguments and authorities supporting his
contentions under the state constitution. Moore v. State, 935 S.W.2d 124, 128 (Tex. Crim. App.
1996); Lawton v. State, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995). Because Appellant failed to
do so, we consider the admission of Cox’s testimony solely under the federal constitution. See
Jackson v. State, 992 S.W.2d 469, 475 n.8 (Tex. Crim. App. 1999); Johnson v. State, 853 S.W.2d
527, 533 (Tex. Crim. App. 1992). 
            Did the trial court err?
            We first examine Cox’s testimony in light of Appellant’s Fifth Amendment protections. As
we noted in a previous opinion in this case, on January 28, Appellant was given two comprehensive
magistrate’s juvenile warnings, outside the presence of law enforcement officers, pursuant to section
51.095 of the Texas Family Code. See State v. Simpson, 105 S.W.3d 238, 239-40 (Tex. App.–Tyler
2003, no pet.); Tex. Fam. Code Ann. § 51.095(a)(1) (Vernon 2002 & Supp. 2005). The next day,
Cox conducted the diagnostic examination of Appellant during which he made the incriminating
statement. There is no indication in the record that he was warned that statements he made during
the diagnostic examination could be used against him at trial. See Simpson, 105 S.W.3d at 239-40;
Cantu, 994 S.W.2d at 734. Additionally, Cox never informed Appellant that she could testify against
him at trial using statements he made during the diagnostic examination. 
            The purpose of the examination was to provide evidence for the certification hearing.
However, once the examination exceeded its intended purpose and became a source of incriminating
evidence against Appellant, the diagnostic examination constituted a custodial interrogation to which
Fifth Amendment protections applied. See Cantu, 994 S.W.2d at 734. Because there was no
evidence that Appellant knew or reasonably should have known that his statements made during the
diagnostic examination would be used against him at trial, he did not waive his Fifth Amendment
rights by making the statement in question to Cox. See id. at 735. Therefore, the admission of Cox’s
testimony at trial violated Appellant’s Fifth Amendment privilege against self-incrimination. See id.
at 736. 
            We next consider Appellant’s Sixth Amendment rights. At the time of the diagnostic
examination, Appellant was not represented by counsel. Moreover, Appellant had no right to have
counsel present during the diagnostic examination. See id. However, this rule is restricted to cases
in which the only purpose of the examination was to provide a determination of whether a juvenile
should be certified as an adult. Id. Here, the use of Cox’s examination was not so limited. Instead, 
her examination was also used as the basis of her testimony in the guilt/innocence phase of
Appellant’s trial. As such, the examination served a “dual purpose.” See id. Thus, the examination
was a “critical stage” of the adversarial proceedings against Appellant and warranted Sixth
Amendment protections. See id. at 736-37. Therefore, the admission of Cox’s testimony at trial also
violated Appellant’s Sixth Amendment right to counsel.
            Was Appellant harmed by the trial court’s error?
            Because the trial court’s error was not “structural” and does not “def[y] analysis by harmless
error standards,” it is subject to a harmless error analysis. Mendez v. State, 138 S.W.3d 334, 339-40
(Tex. Crim. App. 2004) (quoting Johnson v. United States, 520 U.S. 461, 468-69, 117 S. Ct. 1544,
137 L. Ed. 2d 718 (1997) and Cain v. State, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997)). Thus,
having found that the admission of Cox’s testimony constituted constitutional error, we must reverse
unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. 
See Tex. R. App. P. 44.2(a). 
            In conducting our analysis, we first observe that Appellant’s statement as recounted by Cox
during the guilt/innocence phase simply placed Appellant in Davidson’s vehicle at the river. His
mere presence at the river was not an element of the charged offense, nor a criminal act. See Tex.
Pen. Code Ann. § 19.03(a)(2) (Vernon 2003) (defining “capital murder” as an offense if a person
commits murder by intentionally or knowingly causing the death of an individual and intentionally
commits the murder in the course of committing or attempting to commit one or more specified
offenses); Wooden v. State, 101 S.W.3d 542, 546 (Tex. App.–Fort Worth 2003, pet. ref’d)
(concluding that, standing alone, proof that an accused was present at the scene of the crime is
insufficient for conviction as a party). However, the evidence presented at trial showed that
Appellant’s involvement went well beyond what he admitted to Cox. In fact, the following evidence
showed that Appellant was an active participant in Davidson’s murder.
            Pete testified that he heard Appellant tell Danielle “[l]et’s go kill her.” Jennifer testified that
Appellant wrapped Davidson’s head and hands with duct tape, and Pete testified that Appellant
wrapped her head and legs. They both testified that Appellant beat Davidson when he put the cinder
block in the trunk. Jennifer stated that, once at the river, she and Pete stayed in the car while
Appellant and Danielle left the vehicle and “messed” with Davidson. According to Jennifer, she
believed she saw Appellant’s and Danielle’s arms move as if they were throwing something. Pete
testified that he left the vehicle and observed Appellant and Danielle swing Davidson into the river. 
According to Pete, Davidson was moaning and kicking when she was thrown in the river. 
            Officer Charles Floyd Lanier, Jr., an administrative captain with the Palestine Police
Department, testified that Davidson was found in the Neches River with duct tape wrapped around
her mouth and head, her hands behind her back with duct tape on them, and a large cinder block tied
to her ankles. Charles Parker, a latent fingerprint examiner with the Texas Department of Public
Safety at the time of Davidson’s death, testified that he lifted fingerprints from the exterior, center,
and left side of the trunk of Davidson’s vehicle. He identified four fingerprints as Appellant’s right
ring finger, left middle finger, left little finger, and right thumb. These fingerprints were found in
close proximity to Danielle’s fingerprints.
            Dr. Jeffrey Barnard, chief medical examiner for Dallas County, Texas and director of the
Southwestern Institute of Forensic Sciences, testified that Davidson’s hands were duct taped behind
her back, her mouth was taped with duct tape, and each ankle was wrapped with a nylon-type rope
cord and wrapped together, binding her legs. According to Barnard, Davidson suffered extensive
blunt force injuries to her face, head, and body that included bruises, abrasions, and lacerations.
Barnard testified that Davidson may have drowned, smothered, or been rendered unconscious from
her injuries and, thus, was unable to lift her head out of the water. Further, Barnard stated that the
environmental effects of hypothermia may have played a role in her death. Barnard believed that
Davidson was alive when she was thrown into the river and died either from hypothermia or from
finally submerging into the shallow water.  
            Christina Walker, Pete’s sister, testified that on January 26, 2000, Jennifer returned to their
house and stated that they (Pete, Danielle, and Jennifer) took Davidson to the river and tied her up.
Kenosha Walker testified that she was Pete’s sister and Appellant’s cousin. On January 26, Jennifer
returned to their house before 9:45 p.m. Kenosha asked Jennifer what they did with the lady in the
trunk. According to Kenosha, Jennifer said that they, meaning Appellant and Danielle, “killed the
bitch.”
            Based upon this record, we cannot conclude that Appellant was harmed by the trial court’s
error. Appellant, in his interview with Cox, admitted his presence at the scene of Davidson’s murder,
but denied any involvement in the offense. Other evidence confirms his presence at the scene, but
also portrays him as an active participant in the murder. Cox’s testimony was unnecessary to
establish Appellant’s presence at the scene. The remaining evidence overwhelmingly supports a
finding that Appellant participated in Davidson’s murder. Therefore, we conclude beyond a
reasonable doubt that the trial court’s error in admitting Cox’s testimony did not contribute to
Appellant’s conviction. See Tex. R. App. P. 44.2(a). Accordingly, Appellant’s second issue is
overruled.
 
Sufficiency of the Non-accomplice Evidence
            In his third issue, Appellant argues that the evidence was insufficient to corroborate the
testimony of the accomplice witnesses. 
Applicable Law
            Article 38.14 of the Texas Code of Criminal Procedure states that “[a] conviction cannot be
had upon the testimony of an accomplice unless corroborated by other evidence tending to connect
the defendant with the offense committed.” Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979).
However, the corroboration is not sufficient if it merely shows the commission of the offense. Id. 
It is not necessary that the corroborating evidence directly connect the defendant to the crime or that
it be sufficient by itself to establish guilt. Cathey v. State, 992 S.W.2d 460, 462 (Tex. Crim. App.
1999). The corroborating evidence need only tend to connect the defendant to the offense. Id. If the
combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the
requirement of Article 38.14 has been fulfilled. Id. All facts, both direct and circumstantial, may be
examined in ascertaining whether sufficient corroboration exists. Gosch v. State, 829 S.W.2d 775,
777 (Tex. Crim. App. 1991). The test for sufficient corroboration is to eliminate from consideration
the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the
remaining evidence tends to connect the defendant with the offense. McDuff v. State, 939 S.W.2d
607, 612 (Tex. Crim. App. 1997). Moreover, the accomplice witness rule is a statutorily imposed
sufficiency review and is not derived from federal or state constitutional principles that define the
legal and factual sufficiency standards. Cathey, 992 S.W.3d at 462-63.
            Even apparently insignificant incriminating circumstances may sometimes afford satisfactory
evidence of corroboration. Trevino v. State, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). The non-accomplice testimony need not directly link the accused to the commission of the offense. Dowthitt
v. State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). Evidence that the defendant was in the
company of the accomplice at or near the time or place of the offense is proper corroborating
evidence. McDuff, 939 S.W.2d at 613. However, while the accused’s mere presence in the company
of the accomplice before, during, and after the commission of the offense is insufficient by itself to
corroborate accomplice testimony, evidence of such presence, coupled with other suspicious
circumstances, may tend to connect the accused to the offense. Dowthitt, 931 S.W.2d at 249. 
Evidence of flight can be a corroborating circumstance because it demonstrates consciousness of
guilt. Bradley v. State, 48 S.W.3d 437, 442 (Tex. App.–Waco 2001, pet. ref’d).
Analysis
            In conducting our review, we eliminate from our consideration the testimony of the two
accomplice witnesses, Jennifer Simpson and Edward “Pete” McCoy, and determine whether the
remaining evidence and testimony tend to connect Appellant with the charged offense. See McDuff,
939 S.W.2d at 612. In addition to the evidence already described, Davidson’s son testified that she
always parked her car in the garage underneath the house, in the carport up a hill behind the house,
or up the driveway. Thus, it is unlikely that Appellant would encounter and touch the trunk of
Davidson’s vehicle under neutral circumstances. 
            In the January 26 surveillance videotape from Jack-in-the-Box, Appellant was shown entering
the store in close proximity to Pete and Jennifer. Moreover, it appeared that Appellant was wearing
a Green Bay Packers jacket and orange toboggan as described by Jennifer and identified by Pete. A
Jack-in-the-Box sack containing a receipt dated January 26 at 5:14 p.m., an empty straw cover,
napkins, and salt containers were recovered from a wooded area off a roadway. In this area, officers
also discovered Davidson’s purse and other contents of her vehicle. Appellant’s apparent presence
with the other accomplices and the proximity of the Jack-in-the-Box receipt to Davidson’s purse tend
to link Appellant with her disappearance and murder. Dowthitt, 931 S.W.2d at 249. During a search
for Danielle after he became a suspect in Davidson’s disappearance, Appellant was found hiding
under a bed in the middle bedroom of a known cocaine house. Danielle was also discovered hiding
in the house. Evidence of Appellant’s flight demonstrates a consciousness of guilt. See Bradley, 48
S.W.3d at 442.
            Occtayvia Clewis testified that, on January 26, Appellant came to her apartment around
“nighttime.” She admitted seeing Appellant in a Green Bay Packers jacket and identified the jacket
in evidence as his. She could not recall if he was wearing an orange toboggan that night. Christina
Walker testified that Jennifer told her that she, Pete, and Danielle took Davidson to the river and tied
her up. Kenosha Walker testified that Jennifer told her that Appellant and Danielle killed the woman
in the trunk. All this evidence tends to connect Appellant to the charged offense. 
            In summary, the non-accomplice evidence (1) places Appellant’s fingerprints on Davidson’s
vehicle in close proximity to Danielle’s fingerprints, (2) places Appellant at Jack-in-the-Box on the
date of the offense at the same time as Jennifer and Pete were there, (3) suggests that he showed a
consciousness of guilt when he was found hiding in a known drug house with Danielle, (4) indicates
that he wore a Green Bay Packers jacket and orange toboggan, identified as his, on the day of the
offense as shown in the surveillance videotape, (5) places him at the river, and (6) suggests that he
tied up Davidson and helped throw her in the river, where she died. This evidence sufficiently tends
to connect Appellant to the charged offense pursuant to Article 38.14. See Tex. Code Crim. Proc.
Ann. art. 38.14; Cathey, 992 S.W.2d at 462. Accordingly, Appellant’s third issue is overruled.
 
Disposition
            The judgment of the trial court is affirmed.
                                                                                                    SAM GRIFFITH 
                                                                                                               Justice
Opinion delivered October 31, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.

(PUBLISH)